UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JULIANA HERNANDEZ DE CAMACHO,　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Plaintiff,　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　- against -　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
MARTIN O'MALLEY, COMMISSIONER　　　:
OF SOCIAL SECURITY,[1]　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Defendant.　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/20/2024

22-CV-7779 (RWL)

**DECISION AND ORDER:
SOCIAL SECURITY APPEAL**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Juliana Hernandez De Camacho ("De Camacho"), represented by counsel, commenced the instant action against Defendant Commissioner (the "Commissioner") of the Social Security Administration (the "Administration"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that De Camacho was not disabled and therefore not entitled to disability insurance benefits ("DIB") and supplemental social security income ("SSI") from February 7, 2017, her amended alleged onset date, until August 31, 2021, the date she was found disabled.  De Camacho has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to reverse the administrative decision and award benefits or remand the case for a new hearing and

---

[1] On December 20, 2023, after De Camacho filed her complaint against the Acting Commissioner of Social Security, Martin O'Malley became the Commissioner of the Social Security Administration.  *See* Press Release, Martin J. O'Malley Sworn in as Commissioner of Social Security Administration (Dec. 20, 2023), https://www.ssa.gov/news/press/releases/2023/#12-2023-2.

decision.  The Commissioner has cross-moved for judgment on the pleadings, asking the Court to affirm the Commissioner's decision.  For the reasons explained below, the Court GRANTS De Camacho's motion and DENIES the Commissioner's motion.

## APPLICABLE LAW

### A.     Standard Of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner.   42 U.S.C. § 405(g); *Skrodzki v. Commissioner of Social Security Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *accord Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).

"'Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.'"  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (remanding for noncompliance with regulations)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the Administrative Law Judge ("ALJ") were based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp.2d 507, 515, 520, 530 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'"  *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).   "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would **have to conclude otherwise**."   *Brault*, 683 F.3d at 448 (internal quotation marks omitted) (emphasis in original); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."   42 U.S.C. § 423(d)(5)(B).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1).  While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "'reconcile explicitly every conflicting shred of medical testimony,'" *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983), the ALJ may not ignore or

mischaracterize evidence of a person's alleged disability.  *See Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).  The court must afford the Commissioner's determination considerable deference and "'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'"  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary of Health and Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *Dunston v. Colvin*, No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (same) (quoting *Jones*, 949 F.2d at 59), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015).  Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error."  *Dunston*, 2015 WL 54169, at *4 (internal quotation marks omitted) (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

## B.   Determination Of Disability

Under the Act, a person meeting certain requirements and considered to have a disability is entitled to disability benefits.  42 U.S.C. § 423(a)(1).  The Act defines disability

as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled and therefore entitled to benefits, the Commissioner conducts a five-step sequential analysis.  20 C.F.R. § 404.1520(a)(4).[2] First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), (b).  If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not engaged in any such activity, the Commissioner proceeds to the second step and must determine whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(a)(4)(ii), (c).  If the claimant does not have an impairment or combination of impairments that are severe, the claimant is not entitled to benefits and the inquiry ends.

_____

[2] As noted at the outset, this case involves both DIB and SSI benefits.  For present purposes, the regulatory standards for DIB determinations and SSI provisions are essentially the same.  *Canter v. Saul*, No. 3:19-CV-00157, 2020 WL 887451, at *1 n.2 (D. Conn. Feb. 24, 2020) ("The regulations for disability and disability insurance and supplemental security income benefits are virtually identical.  The DIB regulations are found at 20 C.F.R. § 404.900, *et seq*., while the parallel SSI regulations are found at 20 C.F.R. § 416.901, *et seq*.")  For simplicity, in the absence of a material difference, the Court cites to only the DIB regulations.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combinations of impairments are, or medically equal, one of the impairments included in the "Listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment or impairments meet or medically equal one of the Listings, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to step four and must assess the claimant's residual functional capacity ("RFC"), which is the claimant's ability to perform physical and mental work activities on a sustained basis despite his impairments.   The Commissioner then determines whether the claimant possesses the RFC to perform the claimant's past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (f), (h).  If so, the claimant is not eligible for benefits and the inquiry stops.

If the claimant is not capable of performing prior work, the Commissioner must continue to step five and determine whether the claimant is capable of performing other available work.  20 C.F.R. §§ 404.1520(a)(4)(v), (g), (h).  If the claimant, as limited by his RFC, can perform other available work, the claimant is not entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4)(iv), (v).  The claimant bears the burden of proof for the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has established that he is unable to perform his past work, however, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which

the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks omitted).

## FACTUAL AND PROCEDURAL BACKGROUND

The Court sets forth here a brief summary of the case to provide context for understanding the discussion that follows.  Additional relevant facts are referenced in the discussion.

### A.    De Camacho's Claim

De Camacho was born in 1967.  (*See* R. 258.[3])  She obtained a tenth-grade education and previously worked as a babysitter.  (R. 55, 390.)  In 2014, De Camacho suffered a brain aneurysm and then a stroke.  (R. 472, 481.)  On July 8, 2019, De Camacho filed applications for DIB and SSI, alleging onset of disability beginning September 17, 2018, which De Camacho later amended to February 7, 2017. (R. 396.) De Camacho alleges that she became unable to work due to her disabling conditions, which include memory loss, walking issues, diabetes, and high blood pressure.  (R. 302-03.)  The Administration denied De Camacho's claims initially on October 4, 2019, and upon reconsideration on May 13, 2020.  (R. 126-35; 152-63.)  De Camacho then requested a hearing, which was held on August 4, 2021, before Administrative Law Judge Angela Banks (the "ALJ").  (R. 61-80.)  Both Plaintiff and Vocational Expert Amy Vercillo ("VE Vercillo") testified.  (R. 49-80.)  The ALJ issued her decision on September 15, 2021, finding De Camacho disabled since August 31, 2021, but not earlier.  (R. 10-30.)

---

[3] "R." refers to the Certified Administrative Record filed on July 21, 2022 at Dkt. 13.

On November 12, 2021, De Camacho requested that the Appeals Council review the portion of the ALJ's decision that found her not disabled.  (R. 248.)  The Appeals Council denied review on July 13, 2022.  (R. 1-6.)  De Camacho then filed the instant action on September 12, 2022, contesting the Commissioner's decision.  (Dkt. 1.)  De Camacho moved for judgment on the pleadings (Dkt. 18); the Commissioner cross-moved for judgment on the pleadings (Dkt. 20); and De Camacho filed a reply brief (Dkt. 22). The case is now ripe for decision.

**B.   The Medical Record**

The record contains treatment notes and medical opinions from a variety of medical professionals, including primary care physicians, nurse practitioners, surgeons, behavioral health providers, and consultative examiners, all of whom who saw De Camacho at least once between 2018 and 2021.  (R. 418-587.)

**1.  Physical Impairments**

The record indicates diagnoses of diabetes, hypertension, osteoarthritis, cluster headaches, high cholesterol, and kidney disease. (R. 487, 496, 573, 582.)

In 2002, De Camacho was diagnosed with diabetes and hypertension.  (R. 472.) In 2010, De Camacho began seeing Rajesh Patel, M.D. ("Dr. Patel") for primary care and continued to see him through 2021.  (R. 573.)  In addition to treating her diabetes and hypertension, Dr. Patel also treated her for osteoarthritis, cluster headaches, and high cholesterol.  (R. 487, 496, 573.)

In 2014, De Camacho developed two aneurysms, which led to a stroke. (R. 472.) De Camacho reported that as a result of her stroke, she has residual deficits in her upper and lower extremities.  (*Id*.)  She experiences periodic buckling of the legs and uses a

cane for balance. (R. 472-73.)  In December 2014, Dr. Patel submitted a medical request for home care on behalf of De Camacho in which he noted that De Camacho could not ambulate independently unless she used devices and that she required supervision and "constant reminding" to take her daily medications.  (R. 451-53.)

In June 2019, De Camacho was hospitalized for acute cholecystitis and underwent a cholecystectomy to remove her gallbladder.  (R. 418-41.)  She was assessed as stable at the follow-up office visit after her cholecystectomy.  (R. 568.)

The record contains one report from Social Security Consultative Examiner Dr. Dipti Joshi ("Dr. Joshi"), who saw De Camacho for a consultative internal medicine examination in August 2019. (R. 472-75.)  Dr. Joshi diagnosed her with history of two aneurysms with mild residual deficits, diabetes, hypertension, hypercholesterolemia, some difficulty with her memory, and rash.  (*Id*.)

The only radiographic diagnostic images contained in the record appear to be from September 2019.  (R.477-79.). They were reviewed by a Dr. Robert Obedian, M.D., who noted patella alta of the right knee,[4] but said they were otherwise "unremarkable" as to the hips and pelvis.  (R. 477-79.)

The record also contains treatment notes from Joy Ofili, FNP ("NP Ofili"), who began seeing De Camacho for primary care in May 2020.  (R. 528.)  NP Ofili treated De Camacho for diabetes, hypertension, and high cholesterol (technically referred to as

---

[4] "Patella alta is described as abnormally high-riding patella in relation to the femur, the trochlear groove, or the tibia with decreased bony stability.  Patella alta represents an important predisposing factor for patellofemoral instability."  Roland M. Biedert, *Patella Alta:  When to Correct and Impact on Other Anatomic Risk Factors for Patellofemoral Instability*, 41 CLIN. SPORTS MED., 65-76 (2022) (Accessed through the National Institute of Health's National Library of Medicine at https://pubmed.ncbi.nlm.nih.gov/34782076/.)

hyperlipidemia).  (R. 580-86.)  In August 2020, NP Ofili noted De Camacho's lab results showed kidney damage and referred her to a nephrology clinic.  (R. 524-25.)

### 2.  Mental Impairments

De Camacho has been diagnosed with anxiety and depression.  (R. 481-86; 541-47.)

The record contains a report from Social Security Consultative Examiner Arlene Rupp-Goolnick, Ph.D. ("Dr. Rupp-Goolnick"), who evaluated De Camacho in September 2019. (R. 481.)  Dr. Rupp-Goolnick diagnosed De Camacho with generalized anxiety disorder and depressive disorder.  (R. 484.)  She wrote that the prognosis was "guarded" as De Camacho was not in treatment but noted that De Camacho had received a referral for psychotherapy and psychiatric intervention.  (R. 484.)

The record also includes treatment records and an impairment questionnaire from Alexander Alerte, M.D. ("Dr. Alerte"), who saw De Camacho three times from December 2019 through January 2021.  (R. 509, 543.)  Dr. Alerte diagnosed De Camacho with "moderate episode of major depressive disorder, unspecified whether recurrent," for which he prescribed daily trazodone.  (R. 512.)  According to Dr. Alerte, De Camacho reported that she had been depressed for over ten years; had crying spells, lacked motivation, concentration, and energy, experienced sleep difficulties, and had difficulty recalling words when communicating or explaining herself.  (R. 509.)  Dr. Alerte noted that De Camacho was inconsistent in following up with her treatment.  (R. 543.)

In addition, the record contains treatment notes from NP Ofili noting positive screenings for depression on two visits in 2020 and referring De Camacho to a behavioral

health provider.  (R. 525, 531.)  N.P. Ofili's notes also list "Major Depressive Disorder" as one of her diagnoses at a visit in November 2020.  (R. 582.)

## C.    Opinion Evidence

Four doctors provided opinions about De Camacho's functional limitations: treating doctors Patel (primary care physician) and Alerte (psychiatrist), and Administration consultative doctors Joshi (internal medicine) and Rupp-Goolnick (psychologist).

### 1.  Treating Physician Rajesh Patel, M.D.

Dr. Patel was De Camacho's primary care physician from 2010 through 2021.  (R. 573.)  As noted above, Dr. Patel diagnosed De Camacho with diabetes, hypertension, osteoarthritis, cluster headaches, high cholesterol, and depression.  (R. 487, 496, 573.)  Dr. Patel's medical opinions indicate that De Camacho's conditions significantly impacted her functioning.  In June 2018, Dr. Patel completed a Medical Request for Home Care; in response to the question "is the patient able to ambulate independently?" he indicated "no" but that she was able to ambulate "with devices."  (R. 454.)  In November 2019, Dr. Patel noted that De Camacho experienced "deep" pain in her knee and back "almost every day."  (R. 487-488.)  Dr. Patel noted that De Camacho's conditions only allowed her to perform a job in a seated position for one hour out of an 8-hour workday and to perform a standing or walking job for less than one hour out of an 8-hour workday.  (R. 489.)  He noted that De Camacho had significant limitations in reaching, handling, or fingering, and that her symptoms would be severe enough to interfere with attention and concentration for up to one third of an 8-hour workday.  (R. 490.)  Dr. Patel noted that De Camacho would need unscheduled breaks three to four times a day for 30 minutes each

and that she would miss work more than three times a month due to her conditions. (R. 490-91.)  Similarly, in July 2021, Dr. Patel noted that De Camacho had "sharp" pain in her neck, back, arm, and knee, "almost every day."  (R. 574.)  He again opined that De Camacho could perform a seated job for only one hour per day and could perform a standing or walking job for less than one hour per day.  (R. 575.)  Dr. Patel also concluded that De Camacho would need to take 30-minute breaks every hour.  (R. 576.)

## 2.  Consultative Examiner Dipti Joshi, M.D.

De Camacho saw Administration examiner Dr. Joshi for a consultative internal medicine examination on August 13, 2019.  (R. 472-75.)  Dr. Joshi concluded De Camacho had a mix of mild and moderate functional limitations.  (R. 475.)  Dr. Joshi diagnosed her with a history of two aneurysms with mild residual deficits, diabetes, hypertension, hypercholesterolemia, some difficulty with her memory, and rash.  (R. 474-75.)  Dr. Joshi noted that De Camacho developed a stroke from her two aneurysms and exhibited neuropathic symptoms.  (R. 472.)  He noted that De Camacho complained of deficits in her right upper and lower extremities.  (*Id.*)  De Camacho stated she had a home attendant to help with all of her daily activities, but Dr. Joshi noted that the home attendant was not present at the examination.  (R. 473.)  De Camacho reported that she used a cane for balance, which Dr. Joshi noted was medically necessary, due to leg buckling.  (*Id*.)  However, De Camacho needed no assistance changing or transitioning to the exam table, and she had full range of motion of her shoulders, elbows, forearms, wrists, hips, knees, and ankles.  (R. 473-74.)  Overall, Dr. Joshi determined that De Camacho had moderate limitations with squatting, lifting, carrying, pushing, and pulling, and mild to moderate limitations with walking, climbing, and standing.  (R. 475.)

### 3. Treating Psychiatrist Alexander Alerte, M.D.

Dr. Alerte reported seeing De Camacho three times after a "referral from her primary therapist" from December 2019 through January 2021.  (R. 509, 543.)   He diagnosed De Camacho with "moderate episode of major depressive disorder, unspecified whether recurrent," for which he prescribed daily trazodone.  (R. 512.) Dr. Alerte noted that De Camacho was inconsistent in following up with her treatment.  (R. 543.)

Dr. Alerte concluded De Camacho had a mix of mild and moderate functional limitations.  (R. 546.)  Dr. Alerte concluded that De Camacho had mild to moderate limitations in understanding and memory, concentration and persistence, social interactions, and adaptation.  (*Id*.)  In particular, Dr. Alerte found that for up to one third of an 8-hour workday, De Camacho's symptoms limited her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, carry out detailed instructions, perform activities within a schedule and consistently be punctual, work in coordination with or near others without being distracted by them, complete a workday without interruptions from psychological symptoms, perform at a consistent pace without rest periods of unreasonable length or frequency, accept instructions and respond appropriately to criticism, travel to unfamiliar places or use public transportation, and set realistic goals.  (*Id*.)

### 4. Consultative Examining Psychologist Arlene Rupp-Goolnick, Ph.D.

Dr. Rupp-Goolnick evaluated De Camacho for the Administration on September 30, 2019.  (R. 481.)  She concluded that "[t]he results of the examination appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant

enough to interfere with the claimant's ability to function on a daily basis."  (R. 484.)  Dr. Rupp-Goolnick diagnosed De Camacho with generalized anxiety disorder and depressive disorder.  (*Id.*)  Dr. Rupp-Goolnick noted that De Camacho's attention and concentration were mildly impaired and that her recent and remote memory skills were mildly impaired due to cognitive deficits.  (R. 483.)  De Camacho's "[c]ognitive functioning appeared to be below average."  (*Id.*)  However, Dr. Rupp-Goolnick opined that there was no evidence of limitation in De Camacho's use of reason and judgment to make work-related decisions; interact adequately with supervisors, coworkers, and the public; sustain concentration and perform a task at a consistent pace; regulate emotions, control behavior, and maintain well-being; maintain personal hygiene; be aware of normal hazards and take precautions.  (R. 484.)  Dr. Rupp-Goolnick concluded that De Camacho experienced mild limitations in understanding, remembering, or applying complex directions or instructions and sustaining an ordinary routine and regular attendance at work.  (*Id.*)

**D.    Hearing Testimony**

Hearing testimony was taken from De Camacho and VE Vercillo.

**1.    De Camacho's Testimony**

De Camacho testified that she stopped working in December 2016 because she could not stand and had pain in her legs and arm.  (R. 49.)  She could only sit for 20 minutes until she would need to stand and that she could only stand for 10 or 15 minutes before needing to move, lean against a wall, or move to a seated position.  (R. 50.)  She experienced "constant" headaches and sharp back pain.  (R. 52.)  De Camacho also testified that due to osteoporosis, she had sharp pain in her knees and required the assistance of a home attendant eight hours per day, seven days per week.  (R. 53.)  The

home attendant helped with cleaning, preparing meals, and doing laundry as well as carried her to the bathroom, helped her bathe, and occasionally helped her dress. (R. 53-54.) De Camacho used a cane in her home and used a walker when going outside the home. (R. 54.) She said she had problems with attention and concentration and described being unable to respond to questions because she cannot find the right word or remember the question being asked of her. (R. 55.) She also reported having difficulty following television programs, reading a book cover to cover, and remembering to take her medication. (R. 55-56.) She sometimes experiences dizziness and falls. (R. 56.)

**2.    Vocational Evidence**

VE Vercillo testified at the August 2021 hearing that an individual of De Camacho's age, education, and work history, and who could occasionally balance on uneven terrain, stoop, crouch, kneel, crawl, and climb ramps and stairs but never climb ladders, ropes, or scaffolds could not perform De Camacho's past work. (R. 70.) Such an individual could perform other work, such as a products assembler, labeler, or small product packer. (R. 71.) However, if that individual was off task more than 20% of the time during an eight-hour workday, she "would not be able to sustain any competitive work." (R. 72.) Similarly, the individual would not be able to work if either she required a handheld assistive device in one hand for all ambulation (R. 71-72), or she were to miss more than two days of work per month, she would not be able to work. (R. 71-72, 78.)

**E.    The ALJ's Decision**

Following the requisite five-step analysis, the ALJ first determined that De Camacho had not engaged in substantial gainful activity since the alleged onset date of February 7, 2017. (R. 20.)

At step two, the ALJ determined that since the amended alleged onset date, De Camacho suffered from severe impairments consisting of degenerative joint disease, diabetes, hypertension, and chronic kidney disease.  (R. 20.)  The ALJ also determined that De Camacho had non-severe hyperlipidemia, abdominal pain, and headaches.  (*Id.*) The ALJ determined these were non-severe because, variously, they were resolved, unsupported by medical evidence, or otherwise only minimally affected De Camacho's daily functioning.  (*Id.*)  Additionally, the ALJ determined that De Camacho's depressive disorder was non-severe because it did not cause more than minimal limitation in her ability to perform basic mental work activities.  (*Id.*)

At step three, the ALJ determined that none of De Camacho's impairments, individually or combined, met or medically equaled the severity of one of the impairments in the Listings.  (R. 22.)   With respect to physical impairments, the ALJ reviewed the claimant's orthopedic impairments in accordance with Listings 1.18 (abnormality of a major joint in any extremity), 4.04 (ischemic heart disease), 6.05 (chronic kidney disease), and 9.00 (endocrine disorders), contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22.)  With respect to Listing 1.18 (abnormality of a major joint in any extremity), the ALJ acknowledged that De Camacho had been prescribed a cane but noted that physical examinations indicated she had sustained mobility and had not lost the ability to perform fine and gross movements in either extremity.  (R. 22-23.)  With respect to Listing 4.04 (ischemic heart disease), the ALJ noted there was no documentation or medically acceptable imaging demonstrating coronary artery disease or an irregular cardiovascular rate or rhythm.  (R. 23.)  With respect to Listing 6.05 (kidney failure), the ALJ found that although De Camacho's creatine levels were high, none of the other requirements of the

Listings were met.  (*Id*.)  And with respect to Listing 9.00 (endocrine disorder), the ALJ acknowledged that the claimant reported symptoms of diabetic neuropathy and elevated A1c levels, but there was no record of disabling complications.  (*Id*.)  Accordingly, the ALJ found that the record did not establish the medical signs, symptoms, laboratory findings, or degree of functional limitation required to meet or equal the criteria of any listed impairment.  (*Id*.)

As for De Camacho's mental impairments, the ALJ considered the broad areas of mental functioning set out in the regulations for evaluating mental disorders and in the Listings, known as the "Paragraph B" criteria. The ALJ noted that although De Camacho had a medically determinable mental impairment of a depressive disorder, the record established that she had at most mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself.  (R. 20-22.)  Accordingly, the ALJ found that the evidence did not indicate more than minimal limitation in De Camacho's ability to do basic work activities.  (R. 22.)

The ALJ next determined that De Camacho had the RFC to perform light work as defined in 20 C.F.R. 404.1567 and 416.967, except that De Camacho could occasionally balance on uneven terrain, stoop, crouch, kneel, crawl, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds.  (R. 23.)  In formulating De Camacho's RFC, the ALJ considered her symptoms, the extent to which they can reasonably be accepted as consistent with the other evidence, medical opinions, and prior administrative medical findings.  (*Id*.)  The ALJ determined that the claimant's medically determinable impairments "could cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of those symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 24.) Ultimately, the ALJ concluded that although the medical evidence of record confirmed that the claimant had some severe impairments that could cause the alleged symptoms, the evidence did not "support a finding that they render her unable to perform the demands of a wide range of exertionally light work." (*Id.*)

In formulating De Camacho's RFC, the ALJ evaluated the persuasiveness of each medical opinion. The ALJ found persuasive Dr. Joshi's consultative opinions to the extent that De Camacho had mild to moderate limitations with climbing, walking, and standing, but found that "there are few treatment records in the record that are consistent with moderate limitations in lifting, carrying, pushing, and pulling." (R. 25-26.) The ALJ found treating doctor Patel's opinions that the claimant was extremely functionally limited "unpersuasive, as they are not supported by, and inconsistent with, the results of physical exams throughout the record as well as treatment notes." (R. 26.) With respect to mental function, the ALJ found the opinions of treating doctor Alerte and consulting doctor Rupp-Goolnick persuasive in establishing no more than "mild limitation" and that "the claimant has been able to perform the mental demands of work." (R. 26-27.) The ALJ also noted that she had considered the findings of non-examining state agency doctors made earlier at the administrative level, including that De Camacho retained the capacity to perform light work and that De Camacho's mental impairment was not severe. (R. 27.)

At step four, the ALJ found that the demands of De Camacho's past work exceeded the established RFC and therefore, from the alleged onset date, De Camacho did not retain the ability to perform her past relevant work. (R. 27.) At step five, the ALJ found

18

that jobs existed in significant numbers in the national economy that the claimant could have performed – until August 31, 2021 – when De Camacho's age category changed to "an individual of advanced age."  (R. 27-28.)  At that point, the ALJ found, Medical Vocational Guidelines Rule 202.02 directed a finding of disability.  (R. 29.)  Accordingly, the ALJ found that De Camacho was not disabled prior to August 31, 2021, but became disabled on that date and has continued to be disabled through the date of her decision. (*Id.*)

## DISCUSSION

De Camacho argues that the ALJ committed three errors requiring reversal or remand:  (1) the ALJ failed to properly evaluate the medical opinion evidence, particularly with respect to the opinion offered by treating physician Dr. Patel; (2) the ALJ erred in finding De Camacho's mental impairments non-severe; and (3) the ALJ failed to properly evaluate De Camacho's subjective statements.  Pursuant to its independent obligation to evaluate the record for absence of error and substantial evidence, the Court has identified an additional issue:  the ALJ did not fully develop the record as to De Camacho's physical impairments, specifically with respect to De Camacho's use of a cane.  That alone requires remand, mooting, for now, review of De Camacho's first and third arguments. With respect to De Camacho's second argument, the Court concludes substantial evidence supports the ALJ's finding that De Camacho's mental impairments are non-severe.

### A.   Evaluation Of The Medical Opinion Evidence

The ALJ found the opinions of De Camacho's former primary care physician Dr. Patel – who concluded that De Camacho was extremely functionally limited – "unpersuasive" because his opinions were "not supported by, and inconsistent with, the

results of physical exams throughout the record as well as treatment notes." (R. 26.)  In contrast, the ALJ found the opinions of the Agency's consultative examiner Dr. Joshi and the opinions of non-examining state agency medical consultants (who concluded De Camacho had only mild to moderate limitations) persuasive and consistent with the other evidence of record.  (R. 25-27.)  De Camacho asserts the ALJ's rejection of Dr. Patel's medical opinions was an error.  (*See* Pl. Mem. at 10-13.[5])  The Commissioner argues that the ALJ followed agency requirements and properly rejected the opinions of Dr. Patel because they were neither well supported by nor consistent with the other evidence of record.  (Def. Mem. at 5-6.[6])  However, the Court cannot determine whether the ALJ erred in evaluating the medical opinions of De Camacho's physical impairments because the record is materially incomplete.

Whether the ALJ fully developed the record is a threshold issue.  *See Craig v. Commissioner of Social Security*, 218 F. Supp.3d 249, 267 (S.D.N.Y. 2016).  ("The ALJ's failure to develop the record is a threshold issue, because the Court cannot rule on whether the ALJ's decision … was supported by substantial evidence if the determination was based on an incomplete record") (internal quotation marks omitted).  The ALJ has an "affirmative[ ]" duty to "develop the record," which "exists even when, as here, the claimant is represented by counsel."  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  This duty exists where there are "obvious gaps" in the administrative record.  *Eusepi v. Colvin*, 595

---

[5] "Pl. Mem." refers to Memorandum Of Law In Support Of Plaintiff's Motion For Judgment On The Pleadings filed April 19, 2023 (Dkt. 19).

[6] "Def. Mem." refers to Memorandum Of Law In Opposition To Plaintiff's Motion For Judgment On The Pleadings And In Support Of Defendant's Cross-Motion For Judgment On The Pleadings filed June 20, 2023 (Dkt. 21).

F. App'x 7, 9 (2d Cir. 2014).  Failure to sufficiently develop the record warrants remand. *See Butts v. Barnhart,* 388 F.3d 377, 385 (2d Cir. 2004) ("where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate"), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005)*; Rivera v. Barnhart*, 379 F. Supp.2d 599, 603 (S.D.N.Y. 2005) ("Remand is the appropriate remedy when there are gaps in the administrative record or the ALJ has applied an improper legal standard") (internal quotation marks omitted).

Here, the Court finds that the ALJ did not fully develop one key aspect of the medical record:  De Camacho's use of a cane.[7]  Opinions of both Dr. Patel and Dr. Joshi reflect that De Camacho required the use of an assistive device to ambulate (R. 454, 473), and the ALJ explicitly noted that Dr. Joshi "determined that the cane was medically necessary" due to De Camacho's "reported buckling of knees."  (R. 25.)  The ALJ also noted that, per Dr. Joshi's report, De Camacho "relied on a cane for balance."  (*Id.*)  Additionally, De Camacho testified that she used a cane and walker, both of which, she reported, were prescribed by her doctor.  (R. 318.)

The ALJ, however, rejected both doctors' findings as well as De Camacho's statements with respect to the cane.  (R. 22.)  The ALJ observed that "the medical record references the use of a cane all but once" and that "the results of physical examinations indicate that the claimant has sustained mobility throughout the relevant period."  (R. 22.)  Aside from the medical source opinions of Dr. Joshi and Dr. Patel, the medical record is devoid of other references to a cane or assistive device.  Dr. Patel wrote in a 2018 physician's order for personal assistance services that De Camacho was only able to

---

[7] Neither party's briefing addressed the issue regarding De Camacho's use of a cane.

ambulate independently "with devices," but there is no mention of a cane or other assistive device in Dr. Patel's treatment notes.  (*See* R. 454.)  And, as the ALJ also noted, NP Ofili recorded on one visit that De Camacho was "[a]mbulating freely with steady gait."  (R. 25 (citing 581-82).)

To be sure, there are inconsistencies, which the ALJ had the obligation to try to resolve.  *See Hartnett v. Apfel*, 21 F. Supp.2d 217, 221 (E.D.N.Y. 1998) ("if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly").  But the ALJ did not have a sufficient record on which to resolve those inconsistencies.   First, De Camacho testified that she had been "prescribed" a cane by her doctor.  (R.318.)  Particularly given the absence of a medical record indicating that a cane had been prescribed, the ALJ had a duty to develop the record on that issue.  Obvious questions present themselves:  Which doctor prescribed the cane?  When?  If it was Dr. Patel, why is there nothing in the written record about the prescription?  Was a record accidentally omitted from the documents produced from the medical office?  Or was De Camacho not being truthful?  Whether or not De Camacho had been prescribed a cane is a question of objective fact.  It is not an issue of evaluating the claimant's credibility about the extent and limitations of her symptoms.  Indeed, if De Camacho in fact had been prescribed a cane, the ALJ may well have come to a different conclusion about De Camacho's asserted symptoms.

Similarly, if De Camacho in fact had been prescribed a cane, the ALJ may well have reached a different assessment of either Dr. Patel and/or Dr. Joshi's opinions.  In that regard, the ALJ's evaluation of Dr. Joshi's opinion is particularly puzzling.  The ALJ

found Dr. Joshi's opinion to be "persuasive as to mild to moderate limitations."  (R. 26.)  At the same time, the ALJ rejected Joshi's opinion that De Camacho had moderate limitations in lifting, pushing, and pulling.  (*Id.*)  Yet, the ALJ did not address the persuasiveness of Dr. Joshi's opinion with respect to De Camacho's need for a cane.  To be sure, the ALJ did discuss the cane issue in the context of evaluating whether De Camacho's impairments met or medically equaled a listing.  (R. 22.)  There, the ALJ cited Dr. Joshi's opinion as the medical record's one mention of a "cane", as well as De Camacho's reported buckling of her knees, and, in juxtaposition, noted the "results of physical examinations" indicating that De Camacho had "sustained mobility throughout the relevant period."  (*Id.*)  But the only record, other than Dr. Joshi's opinion, the ALJ cited regarding "sustained mobility throughout the relevant period" was a single record of one visit on November 25, 2020.  (*See id.* (citing R. 582).)  That hardly qualifies as "throughout the relevant period," which is February 7, 2017 to August 31, 2021.

The ALJ also did not sufficiently develop the record with respect to De Camacho's reported buckling of her knees and loss of balance.  The ALJ apparently concluded that "sustained mobility" is necessarily inconsistent with knee buckling and loss of balance.  But De Camacho never mentioned, and nothing in the record reflects, anything about the frequency of her purported knee buckling or loss of balance.  Even if De Camacho were to experience buckling and loss of balance intermittently or only occasionally, it would make perfect sense that she would use a cane most of the time as a precaution for when a buckling episode occurred.  The ALJ, however, failed to develop the record on that issue.  Similarly problematic is the ALJ's reliance on a number of "normal findings" that include "steady gait" and, as characterized by the ALJ, "consistent functioning of

extremities." (R. 25.) Exhibiting a steady gait in an office visit – presumably no more than several steps – or normally functioning extremities in multiple visits may or may not be indicative of "sustained mobility throughout the relevant period" and the absence of periodic buckling or loss of balance. But, again, the record is insufficiently developed to leap to the conclusion that the ALJ did.

At least one court in this District has remanded, in part, for this very issue, where "material inconsistencies" in the record included conflicting reports from medical sources as to whether the claimant used a cane to ambulate. *See Diaz v. Saul*, No. 19-CV-6394, 2020 WL 13789033, at *21 (S.D.N.Y. Dec. 30, 2020) ("Similarly discrepant are the observational findings regarding Plaintiff's mobility that were recorded by Dr. Guy, who noted that Plaintiff's [']['g]ait [was] slow and antalgic with the use of a straight cane,' by Dr. Archbald, who noted that Plaintiff walked unassisted with only a 'slight limp,' but that her use of a physician-prescribed walker 'appear[ed] to be medically necessary,' and by the orthopedist, Dr. Benaroya, who noted, in January 2017, that Plaintiff 'mobilize[d] without assistance') (internal citations omitted), *R. & R. adopted*, 2021 WL 243051 (S.D.N.Y. Jan. 25, 2021).

Here, the inconsistencies regarding the evidence as to De Camacho's use of a cane are material because VE Vercillo testified that an individual with the same limitations as De Camacho who used a handheld assistive device for all ambulation would not be able to do any work. (R. 71-72.) Accordingly, the ALJ should have sought clarification from the medical sources in order to develop that part of the administrative record. On

remand, the ALJ should seek clarification or additional records from Dr. Patel's office[8] and from other providers as to whether De Camacho used a cane, including which doctor prescribed the cane, when, and under what circumstances.  The ALJ also should further develop the record with respect to the extent to which De Camacho experienced buckling of the knees and loss of balance.

**B.    Severity Of De Camacho's Mental Impairments**

De Camacho next argues that the ALJ erred in finding Plaintiff's mental impairments non-severe at step two because (1) the ALJ's conclusion that the opinions of Dr. Alerte are persuasive cannot be reconciled with the ALJ's conclusion that Plaintiff has no severe mental impairments, and (2) an undisputed diagnosis of major depressive disorder is "not compatible with a finding that a claimant has no severe mental impairments." (Pl. Mem. at 14-16.)  As the record is complete with respect to the evidence of De Camacho's mental impairments, the Court is able to review the ALJ's decision and concludes that substantial evidence supports the ALJ's conclusion that De Camacho's mental impairments were non-severe.

An alleged impairment will be considered severe only when "'it significantly limits an individual's physical or mental abilities to do basic work activities.'"  *Clark v. Saul*, 444 F. Supp.3d 607, 622 (S.D.N.Y. 2020) (quoting SSR 96-3P, 1996 WL 374181, at *1 (July 2, 1996)); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).  "A non-severe impairment is

---

[8] Although not addressed by the parties, the Court notes another inconsistency in the medical record that the ALJ should also resolve on remand.  In records dated May 5, 2020, NP Ofili wrote that De Camacho was a new primary care patient because her previous physician, Dr. Patel, passed away.  (R. 528.)  Yet, the record contains treatment notes and an impairment questionnaire from Dr. Patel that were signed by him as late as 2021.  (R. 549-77.)

one that is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." *Clark,* 444 F. Supp. 3d at 622. (internal quotation marks omitted).  "If the impairments are not severe enough to limit significantly the claimant's ability to perform most jobs, by definition the impairment does not prevent the claimant from engaging in any substantial gainful activity." *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

In determining whether a mental impairment is severe at step two, an ALJ must consider the broad functional areas of mental functioning set out in the disability regulations for evaluating disorders and the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1), known as the "Paragraph B" criteria.  (R. 21.)  The four functional areas include (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting and managing oneself.  20 C.F.R. § 404.1520a(c)(3).  If the degree of limitation is "[n]one" or "mild" the ALJ will generally conclude that the impairment is not severe.  20 C.F.R. § 404.1520a(c)(4), (d)(1).

Here, the ALJ considered each of the broad functional areas and determined that the record did not support more than a mild limitation in any of them.  (R. 21-22.)  In doing so, the ALJ extensively cited De Camacho's own statements regarding her functional limitations as well as records from Dr. Rupp-Goolnick's consultative examination.  (*Id.*)  The ALJ thus properly concluded that "[b]ecause the claimant's medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is nonsevere."  (*Id.* 22.)

De Camacho asserts that the ALJ failed "to grapple with the opinions from Dr. Alerte that … De Camacho is limited from performing basic work activities up to 1/3 of the day after purportedly crediting the evidence." (Pl. Mem. at 15.) The ALJ, however, did grapple with those opinions. The one-third-day limitation is defined as "moderate" in the questionnaire Dr. Alerte completed. (R. 546.) The ALJ considered the evidence supporting Dr. Alerte's opinions and, while crediting Dr. Alerte's opinions regarding mild limitations, cited both internal inconsistencies in Dr. Alerte's records, as well as inconsistencies with records from other providers, that did not support moderate limitations. (R. 27.) As the Commissioner correctly points out, there is no requirement that the ALJ wholly adopt all of Dr. Alerte's opinions. (*See* Def. Mem. at 10 (citing*, inter alia, Christina v. Colvin*, 594 F. App'x 32 (2d Cir. 2015) (affirming ALJ's decision to discount a portion of the consultative examiner's opinion that was not supported by the record); *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole").)

There is some support in other circuits for De Camacho's argument that a diagnosis of major depressive disorder is generally inconsistent with a finding of a non-severe impairment. (*See* Pl. Mem. at 16 (citing *O'Connor-Spinner v. Colvin*, 832 F.3d 690 (7th Cir. 2016); *Wick v. Barnhart*, 173 F. App'x. 597 (9th Cir. 2006); *Magwood v. Commissioner*, 417 F. App'x. 130 (3d Cir. 2008); *Berry v. Berryhill,* No. 16-CV-1700, 2017 WL 3600415 (S.D. Cal. Aug. 18, 2017); *Bass v. Commissioner of Social Security Administration*, No. 18-CV-3356, 2020 WL 703986 (W.D. Mo. Feb. 12, 2020)).) The Court

is not aware of any similar rule in the Second Circuit.  But, even assuming that major depressive disorder generally should be considered severe, any error in that respect was nonetheless harmless because, in formulating De Camacho's RFC, the ALJ explicitly considered the extent of any functional limitations posed by De Camacho's mental impairments.  (R. 26-27.)  *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (where impairments erroneously determined to be non-severe at step two are considered during the subsequent steps, any error was harmless); *Rodriguez v. Saul*, No. 19-CV-9066, 2021 WL 738348, at *12 (S.D.N.Y. Feb. 25, 2021) ("The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, the ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work.")

For instance, in determining De Camacho's RFC, the ALJ reviewed the evidence from Dr. Alerte and Dr. Rupp-Goolnick and found that both Dr. Alerte and Dr. Rupp-Goolnick were "persuasive in establishing the claimant has been able to perform the mental demands of work."  (R. 27.)  The ALJ specifically referenced mental functional abilities such as "the ability to understand, remember, or apply simple or complex directions or instructions" and "sustaining an ordinary routine and regular attendance at work."  (*Id*. 26-27.)  The ALJ explained that although Dr. Alerte concluded De Camacho had "mild to moderate" limitations in each area of mental functioning, the record supported only mild limitations.  (*Id*. 27.)  In support of that conclusion, the ALJ cited hospital records indicating a negative psychiatric evaluation; mental status examinations from Dr. Alerte indicating that De Camacho's memory and concentration were intact, and insight and

impulse control were "good"; and multiple negative depression screenings with depression questionnaire scores of "0" from the records of Dr. Patel. (*Id*. (citing R. 505, 564, 571).)  The ALJ explained that "there was no indication of any other than stable results upon mental status examination and negative depression screenings."[9] (*Id*.) Further, the ALJ observed that Dr. Alerte found De Camacho was doing well with her trazodone medication. (*Id*.)  The ALJ also pointed to Dr. Alerte's notation that De Camacho was inconsistent in following up with mental health treatment as an additional reason for her conclusion. (*Id*.)  There is thus substantial evidence to support the ALJ's conclusion that De Camacho's mental impairments were not severe and that, regardless, the ALJ took any functional limitations into account in the remaining steps of the analysis.

Even if this Court might reach a different conclusion upon de novo review,[10] under the requisite standard of review, the Court cannot conclude that the ALJ erred in finding De Camacho's mental impairments non-severe.  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  *Genier*, 606 F.3d at 49 (internal quotation marks omitted).  Thus, as here, "[i]f

---

[9] This statement is factually inaccurate, as records from NP Ofili indicated at least two positive depression screenings.  (R. 528-31, 580.)  The error, however, is harmless.  The positive depression screenings indicated only "minimal" or "mild" depression, which are consistent with the ALJ's determination that De Camacho's mental impairments were no more than mild.

[10] For example, although the ALJ wrote that Dr. Alerte's notation that De Camacho's inconsistent follow-up suggested a non-severe impairment (presumably because De Camacho did not feel she needed additional treatment) (R. 27), that same finding could also be viewed as an indication that De Camacho's depression was so severe that she lacked the motivation and capacity to consistently seek treatment.

the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson v. Astrue*, 563 F.Supp.2d 444, 454 (S.D.N.Y. 2008).

Accordingly, the ALJ did not err in finding that De Camacho's depression was a non-severe impairment.

**C.      Evaluation Of Plaintiff's Subjective Statements**

De Camacho argues that the ALJ erred in determining that there was insufficient clinical and objective evidence to support De Camacho's subjective statements about her symptoms.  (Pl. Mem. at 16.)  The ALJ determined that while De Camacho's "medically determinable impairment could cause the alleged symptoms[,] … the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 24.)  As with De Camacho's first argument, the Court concludes that the ALJ's decision to discount De Camacho's subjective statements cannot be evaluated until the record is more fully developed with respect to De Camacho's use of a cane.  On remand, the ALJ will need to reevaluate the validity of De Camacho's subjective statements with the benefit of a full record.

**CONCLUSION**

In sum, while the ALJ properly evaluated the medical evidence as to De Camacho's mental impairments, the ALJ did not fully develop the record as to De Camacho's physical impairments – specifically, her use of and need for a cane. Accordingly, remand is required so that the ALJ can further develop the record and reconsider the medical opinion evidence and De Camacho's subjective statements.  To

the extent not set forth above, the Court has considered the parties' arguments and finds

them to be moot or without merit.  Pursuant to sentence four of 42 U.S.C. § 405(g), De

Camacho's motion is GRANTED, the Commissioner's motion is DENIED, and this case

shall be REMANDED for further proceedings consistent with this opinion.


SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: February 20, 2024
       New York, New York

Copies transmitted on this date to all counsel of record.